IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CROW STRICKLAND,
      Plaintiff,

vs.                                       Case No.: 4:18cv464/EMT

ANDREW SAUL,
Commissioner of Social Security,[1]
      Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* ECF Nos. 8, 9). It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") for review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's applications for child's disability insurance benefits ("CIB") under Title II of the Act, 42 U.S.C. §§ 401, *et seq.*, and supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381–83. Upon review of the record before the court, I conclude the

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019. Pursuant to Fed. R. Civ. P. 25(d), he is therefore the proper Defendant in this case.

findings of fact and determinations of the Commissioner are supported by substantial evidence and application of proper legal standards and that the decision of the Commissioner, therefore, should be affirmed.

## ISSUE ON REVIEW

Plaintiff raises a single issue on appeal, arguing the ALJ erred in failing to adequately evaluate the opinion of consultative examiner Dr. Robert S. Kline, a licensed clinical psychologist.

## PROCEDURAL HISTORY

On February 3, 2015, Plaintiff filed applications for CIB and SSI, alleging disability beginning December 21, 2014[2] (tr. 185–96).[3] The claims were denied initially and upon reconsideration (tr. 91–117). Plaintiff appeared for a hearing before the Administrative Law Judge ("ALJ") on May 24, 2017 (tr. 41–89). On August 31, 2017, the ALJ issued a decision finding Plaintiff not disabled under the Act (tr. 16–39). Plaintiff petitioned the Appeals Council for review of the ALJ's

---

[2] At the hearing, Plaintiff's counsel amended the alleged onset date to October 9, 2013 (tr. 46).

[3] The administrative record, as filed by the Commissioner, consists of eleven volumes (ECF Nos. 15-1 through 15-11) and has 540 consecutively numbered pages. References to the record will be by "tr.," for transcript, followed by the page number. The page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

decision (tr. 1–6). The Appeals Council denied the request (*id.*). The ALJ's decision thus became the final determination of the Commissioner. That determination is now ripe for review.

<u>FINDINGS OF THE ALJ</u>

In her written decision, the ALJ made a number of findings relevant to the issue raised in this appeal:

- Plaintiff has not engaged in substantial gainful activity since October 9, 2013, the alleged onset date (20 C.F.R. §§ 404.1571, *et seq.*, and 416.971, *et seq.*) (tr. 21).

- Plaintiff has the following severe impairments: autism spectrum disorder ("ASD") and anxiety (20 C.F.R. §§ 404.1520(c) and 416.920(c)) (*id.*).

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926) (tr. 23).

- Plaintiff has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following non-

exertional limitations: must perform precisely articulated duties that do not require interaction with others; limited to simple work-related decisions; and can have frequent contact with supervisors, only occasionally engage in casual interaction with coworkers, cannot be assigned to any teamwork activities, and can never be required to interact with the public (tr. 25).

- Plaintiff has no past relevant work (20 C.F.R. §§ 404.1565 and 416.965) (tr. 34).

- Considering Plaintiff's age, education, work experience, and residual functional capacity ("RFC"), there are jobs that exist in significant numbers in the national economy that Plaintiff can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)) (*id.*).

- Plaintiff has not been under a disability, as defined in the Act, from October 9, 2013, through the date of the decision (20 C.F.R. §§ 404.350(a)(5), 404.1520(g), and 416.920(g)) (tr. 35).

## STANDARD OF REVIEW

A federal court reviews the "Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936

F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (*quoting Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

When reviewing a Social Security disability case, the court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)); *see also Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 822 (11th Cir. 2015) ("In determining whether substantial evidence supports a decision, we give great deference to the ALJ's factfindings.") (*citing Black Diamond Coal Min. Co. v. Dir., OWCP*, 95 F.3d 1079, 1082 (11th Cir. 1996)). A reviewing court also may not look

"only to those parts of the record which support the ALJ" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). Review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record." *Flynn v. Heckler*, 768 F.2d 1273 (11th Cir. 1985).[3]

The Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do his previous work "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A). To be eligible for disability benefits, a claimant must prove he became disabled prior to the expiration of the date last insured. *See* 42 U.S.C. §§ 416(i)(3), 423(a) and (c); 20

---

[3] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

C.F.R. §§ 404.101, 404.130, 404.131; *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

Pursuant to 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the Commissioner analyzes a disability claim in five steps:

1.  If the claimant is performing substantial gainful activity, he is not disabled.

2.  If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.  If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.  If the claimant's impairments do not prevent him from performing past relevant work, he is not disabled.[4]

---

[4] The claimant bears the burden of establishing a severe impairment that keeps him from performing past relevant work. 20 C.F.R. § 404.1512; *Chester v. Bowen*, 792 F. 2d 129, 131 (11th Cir. 1986).

5. Even if the claimant's impairments prevent him from performing past relevant work, if other work exists in significant numbers in the national economy that accommodates the claimant's RFC and vocational factors, he is not disabled.[5]

At step five (or step four in cases in which the ALJ decides a claimant can perform past work), the ALJ formulates RFC through interpretation of the medical evidence and the claimant's subjective complaints, based on the impairments identified at step two. *See* 20. C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "[R]esidual functional capacity is the most [a claimant] can still do despite [the claimant's] limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). RFC is then used by the ALJ to make the ultimate vocational determination required by step five.

## FACT BACKGROUND[6]

Plaintiff was twenty-five years old at the time of his hearing before the ALJ (tr. 41, 91). He dropped out of high school after the tenth grade but obtained a General Educational Diploma ("GED") shortly thereafter, passing the examination

---

[5] If the claimant meets his burden at step four, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. *MacGregor v. Bowen*, 786 F.2d 1050, 1052 (11th Cir. 1986).

[6] The recitation of facts set forth below is derived from Plaintiff's testimony at the hearing before the ALJ and the administrative record.

Case No.: 4:18cv464/EMT

the first time he took it, with no preparation (tr. 47–48).[7]  Plaintiff has a valid driver's license, which he obtained at age sixteen, and is able to drive (tr. 49). Plaintiff has a limited employment history.

In 2010, Plaintiff obtained a part-time job at Papa John's Pizza through a family friend who was a general manager (tr. 51).   Plaintiff's duties included taking phone orders, preparing dough, and making pizzas (*id.*).   Plaintiff found it "very difficult" to answer the phone and take orders, although he was able to do it most of the time; when he stopped doing so out of fear of panic attacks and being unprofessional to customers, assistant managers requested that he not be assigned to their shifts (tr. 51–52).   Plaintiff's work hours were then reduced to approximately thirteen hours per week, with Plaintiff working only when the general manager was on duty, primarily making pizza dough (tr. 52–53).   Plaintiff said that when he "could just focus on doing the dough, most of the time [he] did well at it" (tr. 53–54).   He explained, however, that in preparing dough, he had to "deal with flour" and "[s]ometimes that would be overwhelming, like having a mess would be overwhelming to deal with" because he "was expected to answer the phones and do the dough at the same time" and "sometimes [he] would need to answer the phone

[7] Plaintiff's intellect is not in question; in fact, his attorney characterized him as "intellectually very smart" (*id.*).

when [he] had flour on [his] hands, and that would be very stressful" (tr. 54). As long as he was only making dough, though, things were mostly okay (*id.*). Plaintiff ultimately quit the job because the low hours did not justify the amount of money spent commuting to and from work (*id.*). Plaintiff had one other job, training for a position answering telephones at a hotel, which lasted only one week (tr. 55).

Plaintiff sought assistance through vocational rehabilitation beginning at age eighteen (tr. 50). Plaintiff testified that during the time he was working with vocational rehabilitation, he "was also trying to find a diagnosis," as that was before he had been diagnosed with ASD and he "wasn't really sure what was going on" (*id.*). He stopped vocational rehabilitation because he was not "making any progress with a diagnosis" (tr. 50–51).

Plaintiff lives with his father[4] (tr. 56). Plaintiff said he and his father "share all the responsibilities," and he does "whatever [he] can when [he] can" (*id.*). He helps clean out the litter box and feed the cats; he rarely is able to do dishes or vacuum, though, because he finds it overwhelming (tr. 56, 65). With regard to dishes, Plaintiff said "[u]sually they're kind of stacked up and the mixture of kind of being overwhelmed by all the dishes and then dealing with the hot and cold water.

---

[4] According to treatment notes, Plaintiff's biological mother is "FTM transgender" (tr. 522). Plaintiff has no contact with his biological father (*id.*).

I have a lot of sensory issues when it comes to doing the dishes" (t. 56). And the noise of the vacuum cleaner "pushes [Plaintiff] into sensory overload" (tr. 65). The ALJ asked whether Plaintiff had sensory problems when dealing with dough or making pizzas, and Plaintiff responded that he had trouble with the smell of onions and that "it affected [him] when [he] had to put [his] hands on different ingredients," but he "could do it"—it just "heightened [his] sensitivity" (tr. 56–57).

When asked about video games, Plaintiff said he "spend[s] most of his time playing a game called Final Fantasy," playing from the time he wakes up in the morning until the time he goes to bed at night, seven days a week (tr. 57, 64). He explained "[i]t's a role playing game so [he] play[s] as a character, and the point of the game is to acquire equipment and build your character up to where you can fight stronger and stronger enemies" (tr. 57–58). He further explained "[t]here is a social element to that game . . . [b]ut it's a choice. I can decide if I want to play with other people or not," and he frequently plays with other, random players (tr. 58–59). He said "[s]ometimes there are problems, things don't go well and trying to figure that out, trying to explain things or get everyone onto the same page, I have trouble with that. But when everyone knows what to do and it just goes smoothly . . . it's all right" (tr. 60). Plaintiff stated he "tr[ies] to be as prepared as [he] can before . . . go[ing] into a situation" (tr. 61).

The ALJ asked Plaintiff if he had given thought to what he would like to do in terms of employment (tr. 63). Plaintiff responded that after he failed at training for the hotel job, he "had to go to inpatient at Appalachia. So that was kind of a traumatic experience I guess, and that kind of—I decided then that I would focus more on my mental health as opposed to just trying to force myself to hunt for jobs that I wouldn't be able to do, and really figure out what was going on in my head. And in that time period, I got the autism diagnosis" (*id.*). When asked how he felt after getting the diagnosis, Plaintiff said at first it was strange because he was "so old at that point" and it took so long to get the diagnosis, but that "once [he] really understood all of the implications, it was comforting . . . to know that there was a reason why [he] had been struggling so much" (*id.*). The ALJ asked Plaintiff what kept him from trying to find suitable employment now that he has the comfort of knowing he has autism, and Plaintiff responded, "I think that usually my anxiety and kind of being overloaded by the world gets in the way of that[;] [w]henever I try to make an attempt to leave the house" (tr. 63–64).

Aside from visiting a local lake three times a month and attending a doctor's appointment once a month, Plaintiff does not leave the house due to panic attacks (tr. 64, 69). When he walks at the lake, he tries to avoid looking at people because it makes him anxious (tr. 65–66). He no longer talks on the phone (tr. 66–67).

When his counsel asked about social interaction, Plaintiff said he "like[s] to be prepared whenever [he is] talking, and there's an immediacy of social interaction that you have to kind of make things up as you go. You can't be prepared" (tr. 67). And he is not good at "wing[ing] it" (*id.*). Plaintiff "feel[s] like [he] tr[ies] to be polite as much as [he] can but it's—it always gets different reactions from different people so [he is] not sure if it's working or not" (tr. 67–68).

When asked how often he gets panic attacks, Plaintiff said "[i]t depends on how much [he is] pushing [himself], so pretty much any time that [he is] sensitive and [has] to go outside, or if [he has] to go to a store with [his] dad or something" (tr. 68). As of the date of the hearing, Plaintiff had not gone to a store with his dad in several months because "[i]t was very stressful" the last time he did so (*id.*). Plaintiff said it was "just being around people, and there's a lot of stuff in stores, there's a lot of things, just kind of overwhelming I guess" (*id.*). Plaintiff indicated there were some days he could not go to work or school because he was "sensitive" to light or sound (tr. 69). The ALJ reviewed the evidence and clarified that except for one, nine-week period during which Plaintiff had six absences, he otherwise had either one or two absences per nine weeks of school (tr. 70).

Steven Cosgrove, a vocational expert, also testified at the hearing (*id.*). The ALJ asked Mr. Cosgrove to assume a hypothetical individual of Plaintiff's age and

education with no past relevant work; only non-exertional limitations; who will require precisely articulated duties that do not require interaction with others; is limited to making simple work-related decisions; can have frequent interaction with supervisors and occasional casual interaction with co-workers; cannot be assigned any teamwork activities; and can never be required to interact with the public (tr. 71–72). The ALJ asked Mr. Cosgrove whether such an individual could "perform any work in the competitive world" (tr. 72). Mr. Cosgrove responded in the affirmative and said such an individual could be a packer/hand packager, warehouse worker, garment sorter, and small product assembler (*id.*).

Plaintiff's counsel questioned Mr. Cosgrove as well and added to the hypothetical that "anxiety would interfere with [the individual's] ability to interact with others such that he could have less than occasional interaction with supervisors, co-workers and the general public" (tr. 83). Mr. Cosgrove responded "[w]ell, the jobs that I just cited could provide that. I mean there doesn't necessarily need to be occasional interaction. Occasional by—one instance up to two hours and 40 minutes" (tr. 84). Counsel then asked the following: "[i]f someone has extreme limitations in their ability to interact with the public, supervisors, co-workers or respond appropriately to usual workplace settings, would that eliminate all jobs?" (*id.*). Mr. Cosgrove responded, "[i]f you can't respond appropriately to general

workplace standards and changes, I think, that's going to not bode well for a person's employability. It's going to take them out of work. You['ve] got to be able to roll with it, and adjust and to deal with standard workplace dynamics and pressures and changes" (*id.*).

The pertinent portions of the medical record in this case pertain largely to psychiatric treatment, testing, and assessments. In December 2011, Plaintiff visited Apalachee Center, Inc., with feelings of depression and thoughts/plans of suicide (tr. 368). Social worker/intern Dawn Roberts noted Plaintiff had been unemployed for the past three months, having quit his job at Papa John's after being employed for a year (tr. 369). He had a dysphoric mood and flat affect but was receptive to and motivated for treatment (tr. 371). Ms. Roberts recommended medication management and group therapy (*id.*).

Plaintiff returned to the Apalachee Center the following month with suicidal ideation, depression, and anxiety (tr. 367). He had not taken medication since his last admission because he forgot to go to the follow-up appointment (*id.*). He reported "feeling 'lost'" and not "know[ing] what to do," indicating he was having vague thoughts of suicide because he was not aware of any other options (*id.*). He had a dysphoric mood and flat affect (*id.*). He received inpatient care for two days

and was diagnosed with major depressive disorder and prescribed Prozac, Trilafon, and Desyrel (tr. 349, 367).

In May 2013, a Vocational Rehabilitation counselor referred Plaintiff to Tammy Mae Chapman, Ph.D., for a psychological evaluation, advising that emotional difficulties were interfering with Plaintiff seeking and maintaining employment (tr. 489). Ms. Chapman noted Plaintiff had a history of treatment for depression and suicidal ideation but that he was somewhat non-compliant, not taking medication or seeking follow-up treatment (*id.*). She also noted Plaintiff lost his job at Papa John's in November 2011 because he was unable to multi-task sufficiently to handle both answering the telephone and making pizzas (*id.*).

Dr. Chapman noted Plaintiff was casually dressed in clothes that needed washing and had marginal grooming (tr. 490). He displayed psychomotor retardation and low energy (tr. 490–91). His mood was severely depressed and mildly anxious, and he had a flat affect and avoided eye contact (tr. 491). He kept his head down most of the time (*id.*). He spoke sparsely, at a slow rate, and with a low volume but demonstrated an advanced vocabulary at times, particularly during IQ testing (*id.*). His hands shook when he assembled blocks into certain designs under time constraints (*id.*). Dr. Chapman indicated Plaintiff "appeared to do his best to exert conscientious effort in testing" but that "the severity of his depression

and anxiety [were] likely compromising his performance of intellectual and cognitive tests"; she thus considered the results "an underestimate of his functioning in the absence of such severe depression" (*id.*).

With regard to psychological functioning, Dr. Chapman noted "overstatement of difficulties and mild under-rating of coping abilities" (tr. 492). She also indicated Plaintiff reported obsessive worry, depression, and antisocial personality features and "experience[d] conflict between oppressive self-restraint and urges for immediate gratification, causing erratic and unstable behavior" (*id.*). She opined that "conflict between rigidity and rebelliousness, and intolerance of normal demands and stressors, . . . may cause difficulty in sustaining ordinary social roles and responsibilities" (*id.*). She also stated Plaintiff "appears acutely aware of, intensely affected, and painfully hurt by negative things," including ones that seem less noticeable or offensive to others (tr. 493). According to Dr. Chapman, "[t]he extensiveness of depressive symptoms indicates this is a persistent and very troubling condition" (*id.*). Dr. Chapman opined that "[e]veryday circumstances, or anticipation of them, likely cause [Plaintiff] worry, nervousness and apprehension," which "affect social situations, except with a few people with whom he feels the closest" (*id.*). "Such uneasiness," in Dr. Chapman's view, "likely interferes with sleep, concentration, and physical functioning" (*id.*).

On November 14, 2013, Plaintiff again was admitted to Apalachee Center for inpatient treatment (tr. 379). Plaintiff reported anxiety and depression, as well as being withdrawn, socially isolative, agoraphobic, and having recurrent panic attacks (*id.*). He was restless and hypervigilant, had poor eye contact, and was anxious and intermittently tearful, wringing his hands (tr. 380). His thought process was organized, however, and his thought content was normal (*id.*). He was alert and oriented, his memory was intact, his abstraction was normal, and his insight and judgment were fair (*id.*). He was diagnosed with panic disorder, with a need to rule out post-traumatic stress disorder, and prescribed Clonazepam and Celexa (tr. 376). The provider noted Plaintiff's non-compliance was a risk factor (*id.*).

Plaintiff attended individual and family therapy with Morgan Cooley, Licensed Clinical Social Worker ("LCSW"), from January 10, 2014, through March 19, 2014 (tr. 429–56). Ms. Cooley consistently noted Plaintiff was dressed appropriately, oriented "x4," and "mildly anxious" during their sessions; she sometimes noted suicidal ideations without current plan, flat affect, and agitation (*id.*). On March 19, 2014, Plaintiff informed Ms. Cooley he had "removed himself from all of his medications" (tr. 454). Plaintiff did not attend individual therapy appointments on March 28 or April 11, 2014, and his mother advised Ms. Cooley he

would call to reschedule; there are no records, however, of additional sessions (tr. 455–56).

Wayne Denton, M.D., evaluated Plaintiff on February 13, 2014 (tr. 440–41). Plaintiff reported anxiety and mild depression but felt that Clonazepam helped him slow his mind and think clearly, accomplish tasks, and get along more easily in public (tr. 440). Dr. Denton noted Plaintiff was anxious, tense, and looked at the floor, but he found Plaintiff's speech and psychomotor activity to be normal with no evidence of psychotic symptoms or suicidal ideation (*id.*). Dr. Denton assessed anxiety disorder and recommended Plaintiff continue taking Clonazepam and attending individual therapy sessions and return in three months (*id.*).

From March 12 until March 15, 2014, Plaintiff was admitted to Apalachee Center for depression and self-injurious behavior (tr. 393). During a March 13, 2014, mental status examination, Plaintiff was cooperative and well-groomed (tr. 402). He was anxious with a blunted affect, but his thought process was organized and his thought content was normal (*id.*). He denied thought preoccupations, and his speech was clear and coherent (*id.*). His memory was intact, his intellect was fair, his abstraction was normal, and his insight and judgment were fair (*id.*). He acknowledged he had been abusing alcohol while taking Clonazepam and said he

realized he should not mix medication and alcohol (tr. 396). He felt better upon discharge (tr. 393).

On December 21, 2014, Beth Waller Hicks, LCSW, assessed Plaintiff for ASD (tr. 420). Ms. Hicks noted Plaintiff was very talented in music and could play the guitar by ear (tr. 422). He could also play the piano and different electrical instruments (*id.*). Ms. Hicks indicated Plaintiff was very smart but had not excelled in school because he learned in a different manner than most students (*id.*). Ms. Hicks noted Plaintiff was unable to recognize boundaries with others and often had difficulty recognizing social structures (*id.*). He was bothered by uncontrolled sounds and different textures (tr. 420). He also reported no friendships or relationships at the time other than with his father (*id.*). Ms. Hicks indicated Plaintiff was "present in the here and now" and able to recognize current time and place but was shy, had difficulty making eye contact, and often had a flat tone (tr. 422). Based on testing results, Ms. Hicks diagnosed ASD (tr. 423). She recommended Plaintiff receive vocational services "that will assist him with employment and life skills" (*id.*).

On July 3, 2015, Dr. Steven Wise, a state agency psychological consultant, reviewed the record and opined Plaintiff had moderate social functioning and adaptation limitations and would do best in a position with fewer social demands

and a stable environment that is not rapidly changing (tr. 97–99). Dr. Wise opined

Plaintiff was mentally capable of performing simple, routine, and repetitive tasks

and would "benefit from planning and goal setting in his quest for full-time

employment" (tr. 99). Dr. Wise found no limitation in understanding, memory, or

sustaining concentration and persistence (tr. 98).

On October 13, 2016, Plaintiff saw Alanna Steaple, Advanced Registered

Nurse Practitioner ("ARNP"), at the Neighborhood Medical Center, seeking a

mental health referral (tr. 519). Ms. Steaple noted poor eye contact and a flat affect

(tr. 519–20). According to Ms. Steaple, Plaintiff exhibited behaviors consistent

with ASD and agreed he needed counseling but said he would not take mental health

medication (tr. 520).

On October 18, 2016, Plaintiff saw Jordan Montgomery, Registered Marriage

and Family Therapy Intern ("RMFTI"), at the Neighborhood Medical Center (tr.

521). Plaintiff had an appropriate appearance, grooming, hygiene, speech,

psychomotor functioning, impulse control, memory, mental functioning, and insight

(*id.*). Other than social anxiety and minimal eye contact, Plaintiff's interpersonal

behaviors were appropriate (*id.*). RMFTI Montgomery indicated Plaintiff appeared

to be "high functioning ASD, except for when he notices that something is not on

routine" (tr. 522). RMFTI Montgomery also noted Plaintiff intended to find

employment once he and his father had stable income (tr. 523).   Plaintiff stated he was seeking Social Security benefits "for the issues that he has experienced with Autism" (*id.*).

Plaintiff returned to see RMFTI Montgomery on November 1, 2016 (tr. 524). He had an anxious and frustrated mood and congruent affect (*id.*).   He appeared to have appropriate psychomotor functioning, impulse control, and insight (*id.*).   He was cooperative (*id.*).   He indicated he did not want to seek further mental health counseling and wanted psychiatric treatment instead (*id.*).   Plaintiff indicated he was frustrated because he knew he had ASD and wanted to be diagnosed by a psychiatrist (tr. 525).   He indicated his symptoms significantly impaired his ability to find work and maintain employment (*id.*).   He informed RMFTI Montgomery he previously had been diagnosed by a licensed social worker but has felt that since then "he has had to jump through hoops in order to be diagnosed with Autism." (*id.*).

Plaintiff saw a psychiatrist, Dr. Denise Michel, a couple of months later, but Plaintiff was interested only in testing for a diagnosis of ASD, which Dr. Michel could not perform, so the session ended (tr. 527).

On February 23, 2017, Plaintiff went to the L.L. Schendel Speech & Hearing Clinic at Florida State University for an initial communication evaluation due to his "father['s] . . . concerns regarding his pragmatic skills with the hope of receiving a

diagnosis of autism and to determine his potential benefit from therapy" (tr. 533). Plaintiff remained polite and cooperative throughout the two-hour diagnostic session (tr. 538). He "politely declined" breaks, remaining "focused on the upcoming task," and often said "I'm sorry" when he was unable to answer a question or "felt he was displeasing clinicians" (*id.*). He appeared anxious and tense during times he was not directly engaged by clinicians (*id.*). He continued to look down at the table and avoided eye contact throughout the majority of the session (*id.*). He "display[ed] persistent deficits in social communication and interaction across contexts and exhibit[ed] restricted and repetitive patterns of behavior as evidenced by atypical sensory behaviors and resistance to change," consistent with the DSM-V definition of ASD (tr. 539).

Plaintiff's verbal and nonverbal intelligence were within normal limits, and his IQ was 116, which is "just above the average range" (tr. 538). His language skills were below average, his ability to derive meaning from inferences was significantly below average, and his conversational skills ranged from limited or inconsistent to markedly abnormal (tr. 354–35). His speech was rated as "inappropriate" with respect to parameters of rate, stress in words, phrasing (use of pauses), and intonation (tr. 538). Symptoms present in the autism spectrum were "self-reported" in the severe range, which "indicates deficiencies in reciprocal social

behavior and is strongly associated with the clinical diagnosis of autism spectrum disorder" (tr. 535).

According to the diagnostic supervisor, Jarrod Zinser, "[a]ll of these deficits have been apparent since childhood and have continuously impaired [Plaintiff's] daily functioning ability" (*id.*). Mr. Zinser noted that "[d]uring the evaluation, [Plaintiff] displayed a variety of social communication and pragmatic deficits, including a lack of eye contact, little reciprocal to-and-fro exchange, irrelevant detail, and difficulty in making inferences" (*id.*). "Additionally, his voice and fluency were characterized by a monotone quality, frequent pauses, slow rate, and inappropriately soft volume" (*id.*). "He demonstrated strengths in speech production and in overall intelligence" (*id.*). Mr. Zinser recommended Plaintiff enroll in speech and language services (tr. 539). He opined Plaintiff's prognosis for improvement in social communication skills was good, as indicated by Plaintiff's cooperative behavior, awareness of deficits, motivation to embrace his individuality, and familial support, but that it could be hindered by Plaintiff's "lack of apparent motivation to obtain a job or to make friends" (tr. 540).

On February 28, 2017, Plaintiff underwent a one-time consultative examination by Dr. Robert S. Kline, III, a licensed clinical psychologist (tr. 481). Dr. Kline noted Plaintiff was applying for disability benefits due to depression,

anxiety, post-traumatic stress, and ASD (*id.*). Dr. Kline indicated Plaintiff was living in a mobile home with his father and assisted some with household chores and maintenance when able (tr. 482). Plaintiff said he spent his time listening to music, playing bass, and playing video games (*id.*).

Dr. Kline found Plaintiff "polite and attentive," "active and engaged," and "exceptionally cooperative"; he noted Plaintiff "interacted appropriately" with the testing associate and "noticeably increased" his level of effort for more difficult tasks (tr. 484–85). Plaintiff's attire, grooming, and hygiene were appropriate, and Plaintiff reported meeting hygiene needs without significant difficulty (tr. 482–83). Plaintiff walked and moved slowly, but there were no deficits with posture or gait (tr. 483). He exhibited no unusual mannerisms or repetitive gestures, and his motor activity was appropriate (*id.*). Plaintiff presented as distant, and rapport was never fully established (*id.*). He was not defiant or defensive, however, and he responded to direct questions but did not engage in spontaneous speech (*id.*). Plaintiff also did not make eye contact (*id.*). Dr. Kline noted that "connecting with [Plaintiff] socially was extremely difficult" (*id.*).

Plaintiff's speech was slow and soft but well-articulated (*id.*). He described his mood as normal (*id.*). His thought expression was generally rational and logical, and he was able to participate in the interview without distraction, showing no

significant decline in attention (tr. 483–84).  He was able to remember three simple words after latency periods of one, five, and fifteen minutes (tr. 484).  Dr. Kline observed that Plaintiff's nonverbal reasoning abilities were much more well developed than his verbal reasoning abilities, stating that "[m]aking sense of complex verbal information and using verbal abilities to solve novel problems [were] less developed abilities for [Plaintiff]" (*id.*).  Dr. Kline stated Plaintiff's "overall cognitive ability . . . cannot easily be summarized because his nonverbal reasoning abilities are much better developed than his verbal reasoning abilities," but he assessed Plaintiff's reasoning abilities on verbal tasks as generally in the average range and his nonverbal reasoning abilities in the superior range (*id.*).  Dr. Kline diagnosed ASD, depressive disorder, and anxiety disorder and opined Plaintiff had a "psychiatric issue of such severity that it would interfere with his ability to perform simple, repetitive tasks, remember and follow directions, [and] interact appropriately with coworkers, supervisors, and the public" (tr. 486).  He recommended that "a suitable financial surrogate . . . be named, at least initially, in [Plaintiff's] case" (*id.*).

Dr. Kline also completed a medical source statement (tr. 478–79).  In the statement, Dr. Kline opined Plaintiff had moderate limitation in understanding, remembering, and carrying out simple instructions and making judgments on simple

work-related decisions (tr. 478). He indicated marked limitation in understanding, remembering, and carrying out complex instructions (*id.*). He also indicated Plaintiff had extreme limitation in the ability to make judgments on complex work-related decisions; interact with the public, supervisors and coworkers; and respond appropriately to usual work situations and changes in a routine work setting, adding "[h]is ASD will cause [Plaintiff] to have serious problems in all these areas—social interaction and changes in routine will be nearly impossible for [Plaintiff] to successfully manage" (tr. 479). Dr. Kline opined Plaintiff's impairments would affect other capabilities, such as the ability to concentrate, persist, or maintain pace, and explained that "ASD has far reaching impact in nearly all areas of an individual's functioning" (*id.*). Dr. Kline attributed Plaintiff's limitations to ASD and noted "ASD results in an individual having significant difficulty adjusting to changes in routine, social interaction and responsibility" (tr. 478). Dr. Kline opined Plaintiff would "likely be unable to be successful in any competitive occupational setting" (*id.*).

DISCUSSION

Plaintiff argues the ALJ erred in evaluating the opinion of Dr. Kline, a one-time consultative examiner. In evaluating medical opinions, an ALJ considers numerous factors, including whether the doctor examined or treated the claimant,

the evidence the doctor presents to support his opinion, and whether the opinion is consistent with the record as a whole. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). A treating source's opinion generally is entitled to more weight, and an ALJ must give good reasons for discounting such an opinion. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Winschel v. Comm'r Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). The opinion of a non-treating physician, however, is not entitled to any deference or special consideration. *See* 20 C.F.R. §§ 404.1502, 404.1527(c)(1) and (c)(2), 416.902, 416.927(c)(1) and (c)(2); *Denomme v. Comm'r, Soc. Sec. Admin.*, 518 F. App'x 875, 877–78 (11th Cir. 2013) (holding that "[t]he ALJ does not have to defer to the opinion of a physician who conducted a single examination, and who was not a treating physician"); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987) (holding that opinions of one-time examiners are not entitled to deference because they are not treating physicians). An ALJ may reject any medical opinion if the evidence supports a contrary finding. *See Williams v. Comm'r, Soc. Sec.*, 580 F. App'x 732, 734 (11th Cir. 2014) (*citing Sryrock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985)).

Opinions on certain issues, such as a claimant's RFC and whether a claimant is disabled, "are not medical opinions, . . . but are, instead, opinions on issues

reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.*, that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d); *see* SSR 96-5p. Opinions reserved to the Commissioner, even when offered by a treating physician, are not entitled to controlling weight or special significance. *See* SSR 96-5p. Indeed, "[g]iving controlling weight to such opinions . . . would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." *Id.* Although a physician's opinions about what a claimant can still do or the claimant's restrictions may be relevant, therefore, such opinions are not determinative because the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. §§ 416.927(d), 416.945(a)(3), 416.946(c); SSR 96-5p.

An ALJ may choose to accept some conclusions—or restrictions—within an opinion while rejecting others. If such a choice is made, in addition to explaining the overall weight given a particular medical opinion, the ALJ must explain "with at least some measure of clarity the grounds for [a] decision" to adopt particular aspects of a medical opinion. *Winschel*, 631 F.3d at 1179 (internal marks omitted).

Here, the ALJ gave Dr. Kline's opinion only partial weight (tr. 33). Specifically, based on Plaintiff's school records and work history, the ALJ found Plaintiff's social limitations to be marked rather than extreme, as Dr. Kline opined

(*id.*). The ALJ found Plaintiff's educational history "inconsistent with extreme limitation of complex instructions" and gave little weight to Dr. Kline's opinion that Plaintiff would be unsuccessful in *any* competitive occupational setting (*id.*). Finally, the ALJ stated that Dr. Kline is not qualified to assess the vocational impact of impairments and "appears to have relied largely on the claimant's diagnosis itself as an indicator of the severity of his limitations rather than assessing the claimant's condition in an individualized manner" (*id.*).

Plaintiff argues the ALJ erred in four respects with regard to consideration of Dr. Kline's opinion. As the first and second contentions of error, Plaintiff argues the ALJ failed to address two extreme limitations Dr. Kline imposed—responding appropriately to usual work situations or changes in a routine work setting, which Plaintiff contends would preclude employment, and the ability to interact appropriately with the public, supervisors, and coworkers. The ALJ is not required to assign weight to each and every specific finding made by a provider. *Vermillion v. Comm'r of Soc. Sec.*, No. 6:12-CA-1572-ORL-GLK, 2014 WL 906119, at *3 (M.D. Fla. Mar. 7, 2014). Nevertheless, the ALJ plainly considered, and implicitly rejected, the limitations Dr. Kline imposed. Indeed, the ALJ acknowledged the extreme limitations Dr. Kline imposed with regard to responding appropriately to usual work situations or changes in a routine work setting and interacting

appropriately with the public, supervisors, and coworkers (tr. 33) and then included

in the RFC limitations in those areas, restricting Plaintiff to precisely articulated

duties that do not require interaction with others, as well as simple work-related

decisions, only occasional casual interaction with coworkers, no teamwork

activities, and no interaction with the public. Moreover, the ALJ found Plaintiff

capable of unskilled work, which requires the ability to deal with changes in a routine

work setting, further rejecting the extreme limitations Dr. Kline imposed. *See* SSR

96-9P, 1996 WL 374185 (S.S.A. July 2, 1996) (noting that unskilled work requires

the ability to perform various basic mental work-related activities, to include

"dealing with changes in a routine work setting").

However, even if the ALJ had erred in failing to specifically discredit each

discrete subpart of Dr. Kline's opinion, any such error would be harmless because

substantial evidence in the record supports the ALJ's decision to give little or no

weight to those aspects of Dr. Kline's opinion. As the ALJ found, the record shows

Plaintiff is capable of "frequent interaction with supervisors if his activities are

restricted to precisely articulated duties because [Plaintiff's] testimony indicated he

was able to appropriately interact with the family friend who supervised him when

his duties were limited to dough mixing" (tr. 33). "Likewise, [the ALJ noted,] when

being tested by professionals, he has proven capable of following complicated

directions" (*id.*). Plaintiff exhibited no deficits in memory, concentration, or attention; he also responded to direct questions, demonstrated well-articulated speech, and expressed his thoughts logically and rationally (tr. 31, 33, 380, 402, 483–84, 521). Plaintiff performed better than average in school in most subjects and did well on standardized tests (*id*. at 23). Although Plaintiff failed the tenth grade and dropped out of school, he earned his GED the same year with no preparation, passing the examination the first time he took it (*id.*).

In addition, as the ALJ noted, although "tending to be socially isolated," Plaintiff "does not have any habits that would prevent his presence in the workplace where he would be a distraction to coworkers" (*id*. at 33). He demonstrated a flat affect, poor eye contact, and emotional distance during evaluations, but he remained cooperative and polite with appropriate interpersonal behaviors (tr. 30, 402, 521, 524, 538). Finally, the ALJ found that Plaintiff's "capability of playing complex video games over many hours suggests he can perform highly routinized work that does not involve social interaction" (*id*. at 34). In short, although individuals with ASD might have serious or extreme problems in some or all areas of functioning, substantial evidence supports the ALJ's finding that *Plaintiff's* ASD causes social functioning and adaptation limitations but does not prevent him from performing work with significant restrictions in those regards. *See McCruter v. Bowen*, 791

F.2d 1544, 1547 (11th Cir. 1986) ("[T]he 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality."); *see also* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight [an ALJ] will give to that medical opinion."); *see also Battles v. Soc. Sec. Admin.*, 749 F. App'x 920, 923 (11th Cir. 2018) (holding ALJ properly gave little weight to one-time examiner's opinion where opinion was inconsistent with record evidence, including doctor's own findings). And the ALJ imposed strict limitations to account for Plaintiff's impairments. The ALJ thus did not err in rejecting the extreme limitations Dr. Kline imposed.

As the third contention of error, Plaintiff argues that contrary to the ALJ's finding that Dr. Kline was not qualified to assess the vocational consequences of impairments, Dr. Kline was qualified to address the manner in which Plaintiff's mental health symptoms affected his functional ability and, in fact, was consulted for that very purpose. Plaintiff concedes the ALJ was not required to give any consideration to Dr. Kline's opinion that Plaintiff could not work but argues the ALJ was required to consider Dr. Kline's other findings, including that he has moderate to extreme limitations in following instructions and extreme limitations in social

interaction and adjusting to usual work situations. As set forth above, the ALJ plainly considered the limitations Dr. Kline imposed, including that Plaintiff has moderate to extreme limitations in following instructions and extreme limitations in social interaction and adjusting to usual work situations, as the ALJ specifically referenced those findings in her decision. And again, even if she had not, because substantial evidence in the record supports the ALJ's decision to give little or no weight to those aspects of Dr. Kline's opinion, any error with regard to the ALJ's assessment of Dr. Kline's qualification to render the opinion he did would have been harmless. *See, e.g., Stewart v. Comm'r of Soc. Sec. Admin.*, 746 F. App'x 851, 852 (11th Cir. 2018) (noting the court applies the harmless error standard to social security appeals and explaining that "[a]n incorrect application of regulations results in harmless error when the correct application would not contradict the ALJ's ultimate findings and his decision would stand").

Finally, Plaintiff argues the ALJ's assertion that Dr. Kline based his opinion solely on Plaintiff's diagnosis is flatly contradicted by Dr. Kline's report, which details an interview with Plaintiff and his father, a mental status examination, and cognitive testing. Moreover, Dr. Kline did in fact state "ASD has far reaching impact in nearly all areas of an individual's functioning" (tr. 479)—a statement the ALJ could reasonably have interpreted as applying more generally to *anyone* with

ASD, as opposed to applying to Plaintiff in particular. What is more, this was but one factor the ALJ relied upon in assigning less than full weight to Dr. Kline's opinion (*see* tr. 33). Once again, even if the ALJ's characterization of Dr. Kline's report was erroneous, as Plaintiff contends, the ALJ's decision to give only partial weight to Dr. Kline's opinion is supported by substantial evidence in the record and any such error would have been harmless for the reasons set forth above. *See Stewart*, 746 F. App'x at 852.

## CONCLUSION

For the foregoing reasons, the undersigned finds the Commissioner's decision supported by substantial evidence and application of proper legal standards and thus that it should be affirmed. 42 U.S.C. § 405(g); *Lewis*, 125 F. 3d at 1439; *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).

Accordingly, it is hereby **ORDERED**:

1.    The clerk of court is directed to modify the docket to reflect that Andrew Saul, Commissioner of Social Security, is the Defendant.

2.    The decision of the Commissioner is **AFFIRMED**, and this action is **DISMISSED**.

Case No.: 4:18cv464/EMT

3.      The clerk is directed to enter **JUDGMENT** pursuant to sentence four

of 42 U.S.C. § 405(g) **AFFIRMING** the decision of the Commissioner and close

the file.

At Pensacola, Florida this <u>10th</u> day of February 2020.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**